## GEORGE M. DEAN v. WABASH RAILROAD COMPANY, Appellant.

### Division One, June 22, 1910.

1. **BILL OF EXCEPTIONS: Matters Before Trial.** Exceptions to rulings on motions before the trial are not required to be (though doubtless if the rulings are at the same term they may be) included in the one bill which covers the trial. But where those rulings (such as rulings on motions to strike out or motions to compel plaintiff to submit to an examination by surgeons) are at a previous term, exceptions must be taken at that term and preserved in a term bill, but the term bill is not required to be embodied in the final bill. [Overruling dictum in Smith v. Baer, 166 Mo. 393, l. c. 401.]

2. **NEGLIGENCE: Measure of Damages: Character of Prior Business: Earnings: Pleading.** In a suit for damages for personal injuries plaintiff may in his petition state the character of his business prior to his injury and the amount he was earning in pursuing it, and those things are a proper subject for consideration by the jury, but the jury should not be permitted to take into account profits they may conjecture he would have derived from a prosecution of that business if he had not been injured.

3. ————: ————: **Motion to Submit to X-Ray Examination.** Where the court is advised that sometimes an X-ray examination results in injury to the person examined, the court does not err in overruling defendant's motion to compel plaintiff to submit to such an examination.

4. ————: ————: **Hypothetical Question: Subjective Symptoms.** It is proper to base a hypothetical question on subjective symptoms as well as on objective symptoms. So where defendant propounded certain questions based on the plaintiff's objective symptoms as discovered by others, and certain facts, it was

proper to permit plaintiff's counsel on cross-examination to add to those symptoms and facts plaintiff's subjective symptoms as testified to by himself, and to ask a hypothetical question based on all those things.

5. ———: ———: **Hotel Expenses of Others.** Where plaintiff's sister and cousin came to the hotel where he was confined as an immediate consequence of the injury, it was permissible to permit him to introduce in evidence a receipted bill showing he had paid his own and their expenses at the hotel. The necessary expenses he incurred for their board cannot be likened to gratuitous services as nurses by members of one's own household.

6. **EVIDENCE: X-Ray Photographs.** An X-ray photograph is receivable in evidence like any other photographs—with care, required by their unusual scientific use, in laying the foundation for their introduction. Especially may they be used as memoranda by the scientific witness in explaining the condition of the bone alleged to be injured.

7. ———: **Conclusion of Witness.** Testimony by plaintiff that before he was injured he could take hold and push any ordinary business in which he was engaged; now he has to tell others to go; could not stack hay, or plow either walking or riding, wears out quickly, and gets tired, is not conclusions of the witness of his capacity to do business.

8. ———: **Injuries Not Pleaded.** Where the petition alleged plaintiff's "back was bruised and wrenched and greatly injured," and the only objection to the testimony was, "I object to any condition of the back," testimony by a witness that he found a fractured vertebra was not error.

9. ———: **Number Injured in Accident.** It was not error to permit plaintiff to ask, on cross-examination of defendant's conductor, who had testified to the condition he saw plaintiff in after the accident, how many passengers were on the train when the coaches turned over and how many were injured, for the sole purpose of showing that if the witness gave attention to all of those injuries, he could not have closely observed the condition of plaintiff.

10. ———: **Rebuttal.** Where after a witness for defendant had testified that he had measured plaintiff's thighs and found the measurements the same, it was not such error as would authorize a reversal to permit a witness to testify in rebuttal that, since defendant's witness had testified, he had measured plaintiff's thighs and found the one on the side where the injured hip was slightly smaller than the other.

11. ———: Reputation of Witness. Where the reputation of defendant's expert witness is not impeached, it was not error to rule out a question asked one of plaintiff's witnesses, on cross-examination, if he was not a reputable physician. No proof of his reputation was required.

12. ———: Text-Book. It is not error for counsel to hold before him a text-book admitted by the witness to be standard, for the purpose of aiding counsel in forming a question to be propounded to the expert witness.

13. ———: Perjury: New Trial. The statute directing a new trial where "the court is satisfied" that perjury has been committed by the witness, is addressed to the trial judge, and his approval of a verdict for plaintiff shows he was not satisfied that it was based on false swearing; and where the jury might reasonably have believed plaintiff's testimony, that there was a fracture of the femur at the hip, in spite of the fact that there was other testimony that he stood up while overshoes were placed upon his feet, the appellate court will not assume to set aside the verdict as being the result of false swearing on plaintiff's part.

14. MEASURE OF DAMAGES: Argument of Counsel. It was not error for plaintiff's counsel in his argument to the jury to suggest a verdict for $20,000, and to point out that the interest on such sum would not be equal to what he had won by his labor before his injuries, nor was such argumentative suggestion contrary to the usual instructions on the measure of damages.

15. ———: Instruction: Future Loss of Time. An instruction which tells the jury, in estimating plaintiff's damages, to consider his physical condition before and since receiving the injuries, his physical pain and mental anguish before and since; "his loss of time, and such damages, if any, as you may, from the evidence, find it reasonably certain he will suffer in the future therefrom," is somewhat faulty in punctuation, but, when taken in connection with defendant's pointed instruction not to allow plaintiff for loss of time or profits in the future, cannot be held to have authorized the jury to find for loss of time in the future.

16. ———: ———: Loss of Time and Employments. Defendant asked the court to instruct the jury "that there is no evidence in this case of impairment of plaintiff's ability in his capacity as manager or director of his farming, well-boring or other employments, and you can only allow him for such loss of time as the evidence shows he has lost from his employments." Held, as there was evidence that plaintiff lay in a hotel for seven

weeks attended by physicians and nurses, and for months there-after was not able to walk and then only on crutches, the whole instruction should have been refused, and defendant cannot complain that the court struck out the last clause and gave the rest.

17. ———: ———: **Loss of Time: Nominal Damages.** The court, under this evidence, properly refused an instruction to the effect that plaintiff was entitled to no more than nominal damages.

18. **EXCESSIVE VERDICT: Evidence Considered.** Where the verdict has received the approval of the trial court, the appellate court will view the extent of plaintiff's injuries in the light of testimony in his behalf, and it will consider that testimony with the law in view which makes the jury in the first instance the judge of the amount of the award.

19. ———: **$12,500.** Where plaintiff received a severe injury in the hip joint, endured great pain and for several months was disabled from following his usual vocations, and still suffered pain in the region of the hip and its use was somewhat impaired at the date of the trial, which was one year after the accident, yet it also appears from his own testimony that he had to a great extent recovered and was able to superintend and direct his business operations, and his physicians thought as time went on he would continue to improve, though never entirely recover, a verdict for $12,500 was too large by $5,500, and the judgment will be reversed unless he remits the excess.

Appeal from Audrain Circuit Court.—*Hon. Jas. D. Barnett,* Judge.

AFFIRMED CONDITIONALLY.

*J. L. Minnis* and *Robertson & Robertson* for appellant.

(1) The verdict is excessive. 1 Joyce on Damages, secs. 39, 100, 101, 214 and note 72 where will be found a large collection of cases on excessive and reasonable verdicts. Sawyer v. Railroad, 37 Mo. 240; Adams v. Railroad, 100 Mo. 555; Brady v. Railroad, 206 Mo. 509; Rodney v. Railroad, 127 Mo. 676; Stolze v. Trust Co., 188 Mo. 581; Devoy v. Railroad, 192 Mo. 197. (2) The verdict is contrary to the evidence, and is the result

of false testimony on the part of the plaintiff, and defendant is therefore entitled to a new trial. R. S. 1899, sec. 800; 14 Ency. Pl. and Prac., 739; Bank v. Railroad, 61 Ia. 700; Cleslie v. Frerichs, 95 Ia. 83; Rickroad v. Martin, 43 Mo. App. 604; Jaccard v. Davis, 43 Mo. 535; Sly v. Railroad, 134 Mo. 690; State v. Prendible, 165 Mo. 353; Thompson v. Emerson, 118 Mo. App. 234; Mfg. Co. v. Cunningham, 73 Mo. App. 382. (3) The court allowed improper hypothetical questions to be asked over the objections of the defendant. Root v. Railroad, 195 Mo. 377; Russ v. Railroad, 112 Mo. 45; DeMaet v. Storage Co., 121 Mo. App. 105; Smart v. Kansas City, 91 Mo. App. 586; Rogers on Ex. Test., sec. 5; Benjamin v. Railroad, 50 Mo. App. 610; Granger v. Still, 187 Mo. 210; Combs v. Construction Co., 205 Mo. 267; King v. Gibson, 206 Mo. 264; Gibler v. Railroad, 129 Mo. App. 103; Holloway v. Kansas City, 184 Mo. 19. (4) The court erred in permitting the plaintiff to give in evidence the board bill at the Globe Hotel for himself and relatives. That expenditure was not an element of damages, neither was it pleaded. Personal Injuries on Railroads, White, secs. 143, 174, 175; 1 Joyce on Damages, secs. 251, 252; 4 Elliott on Railroads, sec. 1811; Grober v. Derwin, 43 Colo. 495; Vedder v. Delaney, 122 Ia. 583; Sedgwick on Damages (8 Ed.), sec. 48. The allowance of loss of time and cost of living is a double damage. Elliott, supra. (5) Plaintiff's instruction on the measure of damages is error. (a). Except as to the concluding portion, it is a copy of that approved in Curtis v. McNair, 173 Mo. 291. Loss of time is not recoverable for future damages, but that is covered in impaired earning capacity, if any. The paragraph, "his loss of time and such damages, if any, as you may, from the evidence, find it reasonably certain he will suffer in the future therefrom," covers loss of time in the past, and on account of the use of the word "therefrom" covers loss of time in the future. The adverb "therefrom" means "from

this or from that." (Webster.) Then in the forego-
ing clause the syllable "there" refers to some definite
subject. Substituting for "there" the subject "his
loss of time" we have "such loss of time and such dam-
ages, if any, as you may, from the evidence, find it
reasonably certain he will suffer in the future from his
loss of time." Substituting "damages," it reads
"such loss of time and such damages, if any, as you
may, from the evidence, find it reasonably certain he
will suffer in the future from such damages." Ordi-
nary grammatical construction forbids any other than
the first construction. The word "therefrom" does
not relate to the word damages, for the word damages
covers all loss. If the word "therefrom" qualifies
damages then the instruction is a roving commission
as to future damages. Badgely v. St. Louis, 149 Mo.
134; Howes v. Stock Yards Co., 103 Mo. 60. (b) The
instruction directing the jury that it might allow for
amounts expended for nursing was not based on any
testimony in the case, and it was error. Duke v.
Railroad, 99 Mo. 347; Gibler v. Railroad, 203 Mo. 208;
Gibney v. Railroad, 204 Mo. 704; Smith v. Railroad,
108 Mo. 243. Neither can plaintiff recover, as an ele-
ment of his damages, for service rendered him
gratuitously by members of his family, relatives or per-
sonal friends. The exact point is ruled on in Morris
v. Railroad, 144 Mo. 500, and Gibney v. Railroad, 204
Mo. 722. (6) The court erred in permitting plaintiff
to introduce in evidence the X-ray pictures. The jury
could know nothing about these, and the only purpose
for which they could be used in evidence would be to
aid the witness in his testimony. Pictures of this char-
acter depend entirely upon the qualification of the per-
son taking them, and upon the trustworthiness of the
instrument used and the process made use of in taking
them. Wigmore on Ev., sec. 795. (7) The court erred
in overruling defendant's motion to strike out a portion
of plaintiff's petition. Clearly these allegations had no

proper place in the petition. It was pleading evidence, besides laying the foundation for the introduction of evidence as to loss of business, and was outside the rule for the measure of damages for loss of time and loss of earning capacity. The action of the court on this ruling was properly saved by a special bill of exceptions. Tobacco Co. v. Walker, 123 Mo. 663; Lynn Co. v. Bank, 175 Mo. 539; McHugh v. Railroad, 190 Mo. 92; Tarkio v. Clark, 186 Mo. 285.

*Barclay, Fauntleroy & Cullen* for respondent.

(1) The only bill of exceptions that can be considered in this case is the one filed February 25, 1907. Two bills of exceptions at the same term of court are unknown to the law, and the court has no jurisdiction to sign a second bill of exceptions at the same term of court, or to permit a second bill to be filed. R. S. 1899, sec. 728; Atchison v. Railroad, 94 Mo. App. 572; State ex rel. v. Robinson, 129 Mo. App. 147. (2) The bill of exceptions filed February 25, 1907, does not contain a motion for a new trial, or motion in arrest; and there is nothing before this court for review except the record proper. State ex rel. v. Pulliam, 104 Mo. App. 94; Parson v. Clark, 98 Mo. App. 28. (3) The giving of plaintiff's instructions, and the overruling of defendant's motion to strike out certain parts of the petition, are not assigned as errors in the motion for a new trial, and hence such matters are not reviewable in this court. State v. Crites, 215 Mo. 91; Almond v. Modern Woodmen, 133 Mo. App. 382; State v. Kennedy, 207 Mo. 528; State v. McKee, 212 N. W. 138; Lynch v. Railroad, 208 Mo. 1. (4) By answering over, the defendant is precluded from complaining of the action of the court in overruling defendant's motion to strike out parts of plaintiff's petition. McMillen v. Columbia, 122 Mo. App. 36; Jordan v. Railroad, 202 Mo. 418; White v. Railroad, 202 Mo. 539; O'Brien v.

Railroad, 212 Mo. 71; Ewing v. Vernon Co., 216 Mo. 681. (5) The objections made by defendant to the questions propounded to the expert witnesses by plaintiff on cross-examination were indefinite, and defendant's counsel did not state to the court specifically the matters referred to in the objections, and therefore the objections were properly overruled. Kinlen v. Railroad, 216 Mo. 173; State v. Bell, 212 Mo. 125; O'Neil v. Kansas City, 178 Mo. 100. (6) The cross-examiner should be allowed a liberal range, and it is proper to interrogate an expert witness touching all matters involved in the case, and to ask him all questions which are reasonably necessary and proper to test his temper, bias, motives, intelligence, accuracy, credibility or means of knowledge. McFadden v. Railroad, 87 Cal. 464; State v. Porter, 34 Ia. 131; Harvester Co. v. Miller, 72 Mich. 265; Root v. Railroad, 67 N. E. (Mass.) 364. (7) The cross-examiner may base his questions to an expert upon such portion of the evidence as he may see fit to select; and it is well settled that counsel has the right to assume any state of facts in reason which he believes is supported by the evidence, and to ask the opinion of the witness upon the facts so assumed. Railroad v. Valvey, 104 Ind. 409; State v. Privitt, 175 Mo. 225. (8) The court did not err in admitting evidence that plaintiff paid the board bill of himself and those who waited on him at the hotel. He was compelled to remain at the hotel, and required attendants, and the board of himself and his attendants is obviously an element of his damage. The sum expended was only $165, and the jury were instructed to consider only such reasonable amounts as the evidence showed he had expended. Sherwood v. Railroad, 82 Mich. 374; Flayerty v. Railroad, 207 Mo. 338; Railroad v. Zeiger, 182 Ill. 9; Calwell v. Railroad, 57 Hun (N. Y.) 249; Turner v. Boston, 158 Mass. 261; Watson, Pers. Inj., sec. 528, p. 650. (9) Photographs taken by the X-ray process are admissible upon the same principles, under

similar circumstances, and with like effect, as ordinary photographs. State v. Matheson, 103 N. W. (Ia.) 137; De Forge v. Railroad, 178 Mass. 59; Carlson v. Benton, 66 Neb. 486; Miller v. Minturn, 83 S. W. (Ark.) 918; Railroad v. Spence, 213 Ill. 220; Jameson v. Weld, 93 Me. 345; Geneva v. Burnett, 65 Neb. 464; Mauch v. Hartford, 112 Wis. 40; Miller v. Dumon, 24 Wash. 648. (10) The verdict is not excessive. There is nothing in the record to indicate that it was not the calm, impartial judgment of the twelve men who composed the jury. Gordon v. Railroad, 222 Mo. 516; Markey v. Railroad, 185 Mo. 348; Scullin v. Railroad, 184 Mo. 695; Stotler v. Railroad, 200 Mo. 107; Copeland v. Railroad, 175 Mo. 650; Swearingen v. Consolidated Co., 212 Mo. 524; Sotebier v. Railroad, 203 Mo. 702. (a) Under the facts in proof the verdict in this case is lower than some verdicts in personal injury cases approved by the highest courts elsewhere. Phillips v. Railroad, 5 C. P. Div. 280; Dike v. Railroad, 45 N. Y. 113; Gulf Co. v. Shelton, 69 S. W. 653, 70 S. W. 359; Huggard v. Refining Co., 109 N. W. (Ia.) 475; Harrold v. Railroad, 24 Hun 184; Reeve v. Elec. Co., 92 Pac. (Cal.) 89; Railroad v. Kelly, 80 S. W. (Tex.) 1073; Retan v. Railroad, 94 Mich. 146; Smith v. Whittier, 95 Cal. 279; Railroad v. Connolly, 109 N. W. (Neb.) 368; Ehrgott v. Mayor, 96 N. Y. 264; Hall v. Railroad, 46 Minn. 439; Ehrman v. Railroad, 60 Hun 580, 14 N. Y. Supp. 336, 131 N. Y. 576; Railroad v. Holland, 18 Ill. App. 418; Railroad v. Vanlandingham, 85 S. W. (Tex.) 847; Dieffenbach v. Railroad, 5 App. Div. 91; Alberti v. Railroad, 43 Hun 421; Hickinbottom v. Railroad, 15 N. Y. St. Rep. 11, 122 N. Y. 91; Erickson v. Railroad, 32 N. Y. Supp. 915; Shaw v. Railroad, 8 Gray 81; Railroad v. Melton, 105 S. W. 366; McMahon v. Ferry Co., 10 App. Div. 376; Railroad v. Nesbit, 97 S. W. (Tex.) 825; Voss v. Railroad, 49 N. Y. Super. Ct. 535; Railroad v. Simons, 76 N. E. 883; Walker v. Railroad, 63 Barb. 260; Orban

v. Co., 17 Wash. L. Rep. 477; Smith v. Railroad, 86 N. Y. Supp. 1087; Railroad v. Cherry, 98 S. W. 898; Railroad v. Banfill, 107 Ill. App. 254, 206 Ill. 553; Railroad v. Shannon, 4 Ohio Cir. Ct. 449; Railroad v. Souders, 79 Ill. App. 41; Lacs v. Breweries, 70 N. Y. Supp. 672; Railroad v. Ewing, 7 Tex. Civ. App. 8; Fonda v. Railroad, 77 Minn. 336; Railroad v. Brazzil, 78 Tex. 314; Railroad v. Nesbit, 97 S. W. (Tex.) 825; Railroad v. Cherry, 98 S. W. (Tex.) 898; Railroad v. Hynes, 50 S. W. (Tex.) 624; Stewart v. Railroad, 66 N. Y. Supp. 436; Sears v. Railroad, 6 Wash. 227; Railroad v. Chick, 52 N. E. (Ind.) 641. (b) This court has affirmed judgments for large amounts where no physical injury occurred, but only intangible pain and mortification were inflicted. Minter v. Bradstreet Co., 174 Mo. 444; Cook v. Globe Printing Co., 227 Mo. 471.

VALLIANT, J.—On February 16, 1906, plaintiff was a passenger in one of defendant's trains going from Columbia to Centralia. When the train had reached a point about twelve miles from Centralia, where the track runs upon an embankment, the coach in which the plaintiff was riding left the track and turned over on its side down the embankment, so that the floor was higher than the roof of the car; the plaintiff was thrown from his seat and fell, striking his right hip against the moulding in the roof of the car, receiving severe injuries. He brought this suit against the railroad company for damages and recovered a judgment for $12,500, from which judgment the defendant has taken this appeal.

At the trial the defendant admitted its liability, but contended that the plaintiff was not seriously injured; the only question that was left for the jury to decide was in reference to the amount of the damages that plaintiff should recover. The main insistence of appellant now is that the award is excessive, so much so that it could be the result only of prejudice and pas-

sion on the part of the jury. There are a large number
of assignments of error pressed on our notice; they
relate in chief to rulings of the court admitting or re-
jecting evidence and in giving and refusing instruc-
tions.

Without undertaking at this time to analyze the
testimony, the following is the plaintiff's account of the
accident and his injury: He was a farmer, owning a
farm of 400 acres in Audrain county, thirteen miles
northwest of Mexico, seven miles from Centralia. He
was also engaged in the business of boring wells and
running threshing machines. He was thirty-eight years
old, unmarried, in robust health, and weighed about
200 pounds. On the day of the accident he was a pas-
senger in one of defendant's trains going from Cen-
tralia to Columbia. It was a mixed train, two passenger
coaches and several freight cars. To quote his own
words as to the accident: "I heard a snap and several
crashes and the coach began bouncing on the ties. Then
I heard another snap and crash and the coach stopped
still. It bounded back just a little and it began to roll.
There was a terrible crash and it stopped and fell on
its side. There was another crash; my feet flew out
from between the seats where I was. I fell against
the moulding, just above the hat rack, and below the
transom, and fell on my hip. I fell a little bit more
flat this way. I came enough against the corner,
though, to make the hardest part of the lick right here
(indicating), and caught enough of that flat part of the
moulding to reach clear up to the top of this hip bone."
His account of his suffering immediately after the ac-
cident was: "It was a fearful lick, just fearful; I had
to stretch out to roll over, and I fell on my hip and
laid there a little bit. There was a terrible stinging in
my hip; almost unbearable. The sweat came out on me;
I was almost frantic with it; that's all. They carried
me out of the car. After they got me out upon the bank
I stood there for two hours, I suppose. . . . When

I moved it was just like taking my breath; it was fear-
ful and I never had a tooth pulled that hurt any worse.
It was just almost impossible to move. I stood on the
bank awhile and finally they got some cushions and I sat
down. I was beginning to tremble and that hurt me
and racked me terrible, and they started to get a fire
for me—started to take me to a fire at first, and it hurt
me so bad and they were making such slow progress
that they brought a fire; made a fire and sent out a fire
and stopped that trembling and I was as usual then.''
The accident was about 5 o'clock in the evening; he
remained on the bank about three hours; when a relief
train came, he was carried on a stretcher to the train
and was carried to Centralia, arriving there about 9
o'clock; at Centralia he was taken out of the car on
a stretcher through a window and taken to the Globe
Hotel, carried on a stretcher up stairs and put to bed.
He remained in the hotel five weeks and was then tak-
en to his home, about seven miles, on a bed in a sleigh.
At the hotel he was attended by a surgeon who was the
surgeon for the railroad company at that place. The
surgeon's first attention to him was in his capacity as
surgeon for the railroad company, but afterwards at
plaintiff's request he attended him as the plaintiff's
surgeon. That surgeon continued to attend the plain-
tiff during his confinement to the hotel, and he testified
as a witness for defendant that there was no bone bro-
ken but only a bruised hip and bruised and strained
muscle, and he treated him for such. Two other sur-
geons, however, residents of Mexico, who went to Cen-
tralia at the request of the plaintiff's attorney, exam-
ined him while he was at the hotel and testified that they
discovered a fracture in the neck of the femur. Other
examinations were made of him by other surgeons,
some at the instance of the railroad company and some
at his own instance. There was a good deal of expert
and scientific testimony on each side bearing on the
question of the nature and extent of the plaintiff's in-

jury, and the testimony of the learned witnesses on the one side was quite conflicting with that of those on the other side. According to the plaintiff's testimony he suffered greatly during all the time he was at the hotel and for several weeks after he was taken home; the swelling subsided in four weeks after he got home and he could then for the first time stand on his right leg. "During the first four weeks at home the swelling was leaving me a little more all the time; I seemed to be getting a little more strength in my hip and there seemed to be a great soreness some way in this bone. The first walking I done I stepped about three steps one morning; it hurt me considerable, but it didn't have a bad after-effect and the next morning I walked a few steps more, a half dozen maybe, and from there on I gradually got so that I could use my crutches and get around the house." He then described his gradual improvement, but insisted that he suffered all the while; he had never since been able to ride horseback, he could ride about in a buggy but it was still painful to do so. "I have to be carried about, leaning from side to side; it seems like it will tear a piece out of that hip bone; like I had a cut half healed and would tear it open; a terribly piercing pain." At the date of the trial, which was about a year after the accident, he walked with a limp and suffered pain. Since he has been able to go about he has attended to his business, but not with the vigor he had before the accident.

Appellant counsel argue earnestly that the plaintiff's testimony was false and his suffering simulated, and they insist that the great weight of the evidence justifies their criticism; we will refer to that feature of the case again before we conclude the opinion. We will first notice the specific assignments of error.

I. As bearing on the question of the amount of the damages plaintiff has sustained, statements are made in the petition showing the character of the plain-

tiff's business and the amount he was earning in pursuing it, and it is alleged that as one of the results of the injuries he received he has not been able to pursue the business with the activity he used before, and hence there was a diminution of his earning capacity. Defendant filed a motion to strike out that part of the petition; the motion was overruled, and an exception was taken.

Defendant also filed a motion asking the court to order that the plaintiff submit himself to an examination by a disinterested surgeon whom the court would select, and also that he submit to have X-ray photographs made of his alleged injured parts. The court sustained the motion to require the plaintiff to submit to a surgical examination, but overruled the motion to require him to submit to the taking of the X-ray photographs, and defendant excepted. These motions were filed, and the ruling of the court upon them, several days before the trial although at the same term at which the trial afterwards occurred, and the exceptions, were preserved by a special bill of exceptions filed February 25, 1907, during the term, containing only those motions and the ruling on them. After the trial the defendant filed another bill of exceptions containing all the proceedings at the trial and subsequent, and defendant's exceptions in relation thereto.

Respondent presents the point that under section 728, Revised Statutes 1899, there can be but one bill of exceptions taken at one term, and therefore after the signing and filing of the first bill of exceptions the trial court had no authority to sign and allow to be filed a second bill, and since the first bill contained none of the proceedings at the trial nor the motion for new trial, etc., we have only the ruling of the court on the motion to strike out and the motion for the X-ray, and the record proper, to consider.

The section of the statute referred to does not forbid the signing and filing of more than one bill of ex-

ceptions during the term, but the requirement is: "All exceptions taken during the trial of a cause or issue before the same jury shall be embraced in the same bill of exceptions." The exceptions to the ruling of the court on those motions were not taken during the trial of the cause before the jury. Under the ancient common law practice, the bill of exceptions was required to be tendered as soon as the ruling to which the exception applied was made: "The bill of exceptions must be tendered at the trial, for if the party then acquiesce, he waives it, and shall not resort back to his exception, after a verdict is against him." [2 Tidd's Practice, *863.] "Under the strict common law practice each exception should be reduced to the form of a bill when taken, and tendered, settled and signed by the trial judge on the trial." [8 Ency. Pl. & Pr., 462.] Our statute was designed to correct that inconvenient practice: "Section 728. Such exceptions may be written and filed at any time during the term of the court at which it is taken, or within such time thereafter," etc. Then follows the concluding clause above quoted requiring all exceptions taken during the trial before the same jury to be embraced in the same bill. That is the only provision in our statute requiring all exceptions to be embraced in one bill and it is limited, *ex vi termini,* to exceptions taken during the same trial. Exceptions to rulings on motions before the trial are not required to be (though doubtless if the rulings are at the same term they may be) included in the one bill which covers the trial. But frequently those rulings are at a previous term and when that is so the exceptions must be taken at that term and preserved in a term bill of exceptions, but the term bill is not required to be embodied in the final bill which covers the trial. There is a dictum in a former opinion of this court to the contrary of what is just said. [Smith v. Baer, 166 Mo. 393, l. c. 401.] In that case the court was referring to a ruling of the trial court that had

occurred at a term prior to the trial and as to which there was no exception preserved by a bill filed during that term, and it was held that this court could not review that ruling for that reason. The court said: "If the defendant desired to have that action reviewed he should have filed a bill of exceptions to that ruling, at the October term, 1895" (the term at which the ruling was made). To that extent what this court said was authoritative and correct, but following the words above quoted, the court added these: "and have embodied that term bill of exceptions in his final bill of exceptions filed after final judgment, at the April term, 1897." Since there was no term bill of exceptions in that case the words last quoted were not necessary to the decision. The St. Louis Court of Appeals quoted those words as announcing the approved doctrine of this court, in Pace v. Roberts, 103 Mo. App. 662, l. c. 668. But we now hold that those words were unnecessary in that case and that they do not state the correct rule of practice. Term bills properly taken and filed come up on appeal and are considered by the appellate court without being embodied in the final bill of exceptions.

We hold therefore that the bill of exceptions covering those two motions is properly before us for consideration and so also is the bill of exceptions filed September 25, 1907, covering the exceptions taken at the trial of the cause.

II. We will go back now to the consideration of the exceptions preserved in the special bill of exceptions filed February 25, 1907. There was no error in overruling the motion to strike out part of the petition relating to the nature and extent of the plaintiff's business and the income plaintiff usually made by attending to it. The plaintiff was not entitled to have the jury take into account profits they might conjecture he would have derived from the prosecution of his

business if he had not been injured, nor did the instructions given for the plaintiff allow them to do so, on the contrary an instruction given for the defendant expressly forbade them to do so. But the value of his time was a proper subject for the jury's consideration, therefore the character of his business and his personal capacity for conducting the business as shown by its hitherto successful operation was a proper subject to be considered.

As to the motion to require the plaintiff to submit to a surgical examination by a surgeon to be selected by the court and to submit to an X-ray photograph process, the court sustained the motion to the extent of the surgical examination, but overruled the motion for the X-ray photograph, because the court was advised that sometimes the subjecting of a person to that process resulted in danger to him. Therefore the court did not err in that matter.

III. Defendant called some expert witnesses and propounded to them hypothetical questions based on certain objective symptoms which some of the witnesses testified they had found on physical examination of the plaintiff and on certain facts to which witnesses testified, and asked the expert witnesses their opinions as to the injury plaintiff had received based on those symptoms and facts. To such questions the witnesses answered giving opinions indicating that the plaintiff's injury was not very serious. On cross-examination plaintiff's attorney supplemented those hypothetical questions by asking the witnesses to take into consideration also certain subjective symptoms to which the plaintiff had testified and then give their opinions based on the whole case, that is, symptoms and facts contained in the defendant's questions together with those supplemented by the plaintiff's questions. Defendant objected to the questions on the ground that subjective symptoms should not be taken into account.

The court overruled the objection and defendant excepted.

Objective symptoms are those which the surgeon discovers from a physical examination of his patient; subjective symptoms are those he learns from what his patient tells him. When a surgeon is called to serve a patient who has received an injury, the full extent of which he is unable to learn by his own sense of seeing, feeling or hearing, he puts questions to the patient and learns from him what he can of the hidden injury; he asks him what pains he feels or what other sensations he experiences, and from those sources he forms his opinion on which he prescribes for his patient. A surgeon is not always bound to take as truth what his patient tells him, because sometimes the facts which his own physical examination has shown may in his mind prove that the patient's statement is incorrect, sometimes he may shrewdly detect a willful suppression or misrepresentation, sometimes a delusion. But when he has no cause to suspect untruth or delusion he takes what his patient says, and weighs the subjective symptoms with those he has discovered, and on them he bases his diagnosis and proceeds to his prescription. Why should not a surgeon when he is called as an expert witness, and asked his opinion on a hypothetical case, take into account the same character of facts that he would when called to attend a suffering patient? Objective symptoms are no more realities than subjective symptoms if both are true. Objective symptoms depend for their proof as much on the candor and capability of the witness testifying in regard to them as do subjective symptoms; a witness testifying to an objective symptom is as liable to be mistaken as one testifying to a subjective symptom, and perhaps more so, because one searching in the body of another to discover if there is a broken bone so deeply imbedded in flesh and muscle as to put it beyond the sense of touch, may fail to hear the grinding of the broken bone

although there might be a broken bone, but the man himself could scarcely be mistaken if he felt an acute pain in a certain part of his body. The testimony in this case illustrates what we are saying; we have in this record learned and highly respectable surgeons who have made personal examinations of this man, some of whom testify that there was no evidence of a broken bone and others just as positive there was, and, along with both, we have the plaintiff testifying to certain pains and sufferings. How can it be said that the statement of one is any more entitled to be considered than another? An opinion given in answer to a hypothetical question is based on an assumption that the facts supposed are true, but at last it is for the jury to find from the evidence whether the supposed facts are proven; if the jury finds that the facts are not proven they will disregard the opinion based on them.

If a physician is testifying as to the condition of a patient whom he has examined, then it is proper to draw a distinction between the objective and the subjective symptoms, but when he is asked for an opinion on a hypothetical case he must assume the truth of the one as well as that of the other.

The court did not err in overruling the objection to the hypothetical questions propounded by plaintiff's attorney.

IV. A physician who had been appointed by the court to examine the plaintiff was called as a witness by defendant and questioned as to the examination and the result, and testified that he could find no evidence of any injury at all; he said: "I, of course, got the history of his injury and his family history, his own personal history, and then made the physical examination." Then after stating the process of his examination and the result, he was asked by attorney for the defendant: "Q. Did he claim at the time in the accident there was any injury to his back? A. Well, I don't know about that, outside of being in and around

the hip; he told me he had some minor bruises of no consequence, I remember his saying his thigh was bruised further down.'' On cross-examination by plaintiff's attorney he was asked to state the history of the case as it had been stated to him by the plaintiff and he proceeded to do so from the time of the accident down to the time of the examination. To the statement coming down to the condition at that time, counsel for defendant objected on the ground that it was an unnecessary basis for the examination. In response to a question suggested by the court the witness said: ''I told him to tell me every thing he knew about his case and his condition.'' The court overruled the objection; that ruling is assigned for error. There was no error in that ruling. The defendant in examination in chief had brought out the fact that the physician had obtained from the plaintiff a full history of his case. The physician certainly did not ask a full history of the case from mere idle curiosity, but because he wanted to use the information in connection with the examination he was about to make, and the conclusion he reached doubtless took into account that history; the plaintiff had a right to let the jury know on what foundation the witness's conclusion, as to the degree of the injury, had been based.

V. Plaintiff was confined five weeks at the hotel in Centralia, during which period his sister and a cousin remained with him and nursed him; when he left he paid the hotel bill for himself and his two relatives which amounted to $165; he gave that bill in evidence as one of the items of his damages and of that defendant complains. There was no error in admitting that evidence. His boarding at the hotel was an immediate consequence of his injury and although his sister and cousin were not hired as nurses, nor was there any item of nurse hire claimed, yet they were in fact nurses and the expense incurred by the plaintiff

for their board was in the nature of expense for nursing. Defendant insists that the services rendered by the sister and cousin are like the gratuitous services of a member of the family who assists in nursing another member of the family. [Gibney v. Transit Co., 204 Mo. 704, l. c. 722.] But such is not this case; here the relatives came from their homes to perform this service and although they charged nothing and expected nothing in the way of wages, yet the necessary expense they incurred for board while attending him was a legitimate item of the expense incurred by the plaintiff in consequence of his injury.

VI. Appellant complains that plaintiff was permitted to introduce in evidence certain X-ray photographs. There were four such photographs offered in evidence, two taken by or under the direction of Dr. Brokaw of St. Louis and two by Dr. Graham of Columbia. As we understand the record the first two mentioned were, on objection of the defendant, excluded, the last two mentioned were admitted.

It seems that at the request of the defendant the plaintiff went to St. Louis and submitted himself to an X-ray examination by Dr. Brokaw, and plaintiff testified that after he had so submitted himself, on parting with Dr. Brokaw, the latter promised to send him photographs showing the result of the examination, and that he afterwards received the two photographs offered, by mail purporting to come from Dr. Brokaw. But plaintiff had no knowledge that the pictures came from Dr. Brokaw except as above stated, he did not see them made and did not receive them in person from Dr. Brokaw. They were not afterwards offered in evidence by the plaintiff.

As to the two photographs taken by Dr. Graham at Columbia, when they were offered defendant objected on the ground that the witness, Dr. Graham, had not qualified as an expert in such matter. Then the

witness was questioned and cross-questioned on that subject and testified that he owned an X-ray machine and was familiar with its use and operation, that he examined the plaintiff with it, taking observations of both hips; after taking the negatives with his X-ray machine, he took them to a photographer and had the pictures developed, the operation of developing and printing the pictures was done by the photographer under the supervision of the witness, who understood the art, and that the pictures were correct photographs. Defendant again objected on the ground that the pictures were too indefinite and uncertain, could give the jury no information whatever, that they were not admissible in evidence in any view, they could be made use of only as memoranda by the witness. The objection was overruled. The witness was then interrogated and cross-examined to explain to the jury the meaning of the photographs, which he did, explaining that it was the bone that caused the shadows in an X-ray photograph. The witness pointed out certain parts of one of the pictures which showed the enlargement of the upper part of the right thigh bone, and testified that that indicated a fracture near the base of the great trochanter of the femur.

Even on the theory of the defendant, that such a picture is, in itself, not evidence, but only serves as a memorandum to assist the expert witness in his explanation, these pictures were properly admitted in evidence and were used to illustrate the scientific explanation of the witness. Appellant cites a high authority on the subject of evidence as holding that X-ray photographs are not admissible in evidence. [Wigmore on Ev., sec. 795.] But we do not so understand that distinguished law-writer. While discussing the use of scientific instruments to aid the natural senses, he refers to the X-ray process of observation, and says: "In practice, indeed, it is perhaps no more common to employ the photographic record in using

vacuum-rays than in using the astronomical photograph for certain kinds of work. The process or instrument of observation, then, being duly testified to as trustworthy, it follows that a photograph of its images would always be receivable like any other photograph." The art of making photographs of the bones of a living man by use of the X-ray is yet still more in the keeping of science than the art of common photography, but that fact only requires more care in laying the foundation for the introduction of such photographs, it does not exclude them from evidence. It was not error to admit those photographs in evidence.

VII. After the close of defendant's testimony the plaintiff recalled one of his witnesses and asked him if at a time when the physician who was attending the plaintiff was present he called the physician's attention to the condition of the plaintiff's back and if so what the physician said. When the question was asked the counsel for defendant said: "Now, what foundation was laid for that?" The court replied that the question had been asked the physician. Then the witness answered to the effect that he had called the doctor's attention to a blue and black spot on plaintiff's back and that the doctor said he had not noticed it before, if he had he would have mentioned it in his report to the company. This was the company's regular physician and was defendant's witness. Witness was then asked in what position the plaintiff's foot was when he was lying in bed; the defendant's attorney made objection as follows: "I object to any testimony as to what was done as to the treatment of Mr. Dean or anything that took place which should be testimony in chief." The court overruled the objection and defendant excepted. The witness then testified that they kept a pillow under his knee and when they turned him on his left side they put pillows between the legs, and when asked if he noticed the position

of the right foot he answered that it was inclined to turn out. The plaintiff's sister testified to the same effect. The objection now urged is that this was testimony in chief and should not have been admitted in rebuttal. Defendant's expert witnesses had testified that if there had been a fracture of the femur the foot would turn in or out, it would not remain in its normal position. This testimony was to show that this condition existed, and it was in direct rebuttal. Defendant had a right to argue from the fact that the testimony came after the defendant's witnesses had stated what would be the result of such a fracture, that the testimony was not trustworthy, but on the other hand, it could be argued that these witnesses of the plaintiff, being laymen, might have omitted to mention the position of the foot in their testimony in chief as a fact that they did not consider of sufficient importance to notice. But however that may be, its credibility was a question for the jury. The court did not err in admitting this testimony.

VIII. It is assigned for error that the court permitted plaintiff to draw his conclusions as to his capacity to pursue his callings. Counsel for plaintiff asked him if he experienced any difficulty then in pursuing his ordinary avocations, and if so what. Objection as calling for a conclusion. The court said: "Let him state what the difficulty is, if there is any; the objection is overruled." The answer was that before he was hurt he could take hold and push any ordinary business in which he was engaged, could go ahead, now he has to tell others to go; could not stack hay, or plow either walking or riding; wears out quickly, gets tired. We do not discover any error in the admission of that testimony.

IX. It is complained that the court erred in admitting evidence that the plaintiff had a fracture of the vertebra, because there was no such injury stated

in the petition. Among other specifications of injuries the petition states that the plaintiff's "back was bruised and wrenched and greatly injured." The witness, a surgeon who examined the plaintiff, was asked if he discovered anything the matter with his back and in answer said: "At the time I made the first examination I didn't notice that fractured spinous process of the vetebrae, but since that time I examined it and found the bone cells thrown out of each side of that aversion." He had previously spoken of an aversion of the foot. When the question concerning the back was asked, the counsel for defendant did not object on the ground that there was no allegation of that kind in the petition, but the objection was: "I object to any condition of the back." The objection was overruled. The court did not err in so ruling.

X. The conductor of the train was a witness for the defendant and in his direct examination was asked what he observed of the plaintiff after the accident and before the relief train came. He stated that he saw him and he saw two men putting his overshoes on him while he was standing, saw him start to the relief train walking between two men, only saw him go a short distance, then witness's attention was turned to other persons. On cross-examination the counsel for plaintiff asked witness how many passengers were on the train when the coaches turned over and how many were injured; counsel for defendant objected to the question as "incompetent and immaterial." Counsel for plaintiff stated that the purpose of the question was to ascertain how much time the witness had "to look after this one man;" the court admitted the evidence for that purpose only. The witness stated that there were twenty-five passengers and twenty-two were injured, some seriously. Further questions were asked to learn what attention

the witness gave to others and what he observed as to their condition. These questions were all aimed to show that if the conductor gave attention to all the injured within the time they were waiting for the relief train his attention was so much divided that he could not have observed very closely the condition of the plaintiff. That was legitimate cross-examination of an adversary's witness.

XI. It is complained that the court erred in permitting the plaintiff to introduce in rebuttal the evidence of a physician to the effect that the right thigh of the plaintiff was atrophied. As well as we can judge from the colloquy between the court and the counsel when this evidence was offered, the following was the state of the case: One of the physicians who had testified for the defendant had made an examination of the plaintiff during the trial, whether after or before the testimony for the plaintiff had been concluded we do not quite understand, but after that witness had testified the plaintiff had himself examined by another physician, seemingly with a view to contradict that witness on certain points, and he was called for that purpose. That witness had testified that he had measured the circumference of the plaintiff's right thigh and found it the same size as that of the other leg. The court ruled that the witness offered by plaintiff in rebuttal might testify as to the measurements, but nothing else; thereupon the witness testified that he had measured the right thigh and had found it "smaller than the left, slightly, a little below the hip." That was all that the court permitted the witness to say. When we read this great mass of expert testimony covering over 500 pages, it is impossible to conceive that this little fragment of evidence could have injuriously affected the defense. It is at all events not such an abuse of the trial court's discretion in admitting evidence out of its order as to justify a reversal of the judgment.

XII. In the cross-examination of one of defendant's witnesses counsel for the plaintiff asked: "Q. I say, if you examine the patient shortly after he has received his injury and you find crepitation both by using your finger and your ear, found crepitation in that joint, what's that a sign of?" Counsel for defendant: "I object to that for this reason, 'Soon after the injury' is too indefinite." The court: "Well, Doctor, if you find the question too indefinite to answer from an expert standpoint say so; the court can't tell; the objection is overruled." The witness answered: "If you find crepitation to the bone you would say there's an injury." That is one of the assignments of error by appellant. We find no error in the court's ruling on that point.

XIII. On the cross-examination of one of plaintiff's witnesses counsel for defendant asked him a question intended to adduce evidence that the physician who attended the plaintiff while he was at the hotel in Centralia, and who was one of defendant's witnesses, was a reputable physician, but the court sustained plaintiff's objection to the question. That ruling is assigned as error. There was no error in that ruling. The reputation of that physician was not questioned, no proof of his reputation was required, his character stood unimpeached before the court and jury.

XIV. On cross-examination of one of defendant's expert witnesses counsel for plaintiff asked him if he was familiar with the International Text-Book of Surgery and if it was a standard text-book, to which the witness answered yes; then the counsel asked a question, presumably with that book before him and based on the text of it, although that fact is not clearly shown by the record. Counsel for defendant objected to the question based on the book as hearsay evidence. The court overruled the objection. Counsel read noth-

ing out of the book to the jury; if he had a book before him the only use he made of it was to aid him in forming a question to be propounded to the witness. There was no error in that.

XV. Appellant in his brief says that the verdict is the result of false testimony on the part of the plaintiff, and therefore under section 800, Revised Statutes 1899, the motion for a new trial should have been sustained.

Section 800 is addressed to the trial judge and specifies certain conditions under which it is made the imperative duty of the trial court to grant a new trial, and among these is, that when "the court is satisfied that perjury or mistake has been committed by a witness, and is also satisfied that an improper verdict or finding was occasioned by any such matters." The record shows that the trial judge was alert to his duty in the long and difficult trial of this case. If he had been satisfied that the verdict was the result of perjury on the part of the plaintiff or his witnesses he would not have sent the verdict to this court stamped with his approval. We do not find anything in the record that justifies the imputation of perjury. The plaintiff himself was before a jury of the county in which he had lived for more than thirty years; not a witness was called to impeach his character. There was nothing in the conduct of the case that indicated any disposition on the part of the plaintiff to avoid a full examination; although the court had refused to order him to submit to the X-ray process of examination, yet he yielded to the request of the defendant and submitted to such examinations by physicians named by defendant.

It is argued as to his discredit that he testified that he could not cross his legs, yet he did sit with his legs crossed while testifying. This is what the plaintiff said on that subject: "A. Well, sir, it hurts me to

cross my legs; I can relieve considerable of the strain of crossing my leg by lifting my leg that way, and sometimes I cross my legs without lifting, but one reason I cross my legs, this pain here goes across here and there's a sore place on the bone, and if I sit up here that hurts me; if I can raise this leg up and cross my leg it raises this part of the hip up just enough that I am sitting on this other hip instead of that one; I am throwing the bulk of the weight over here, and I sit that way a large part of the time; it's easier for me.''

It is also argued as to his discredit that immediately after the accident and while he was standing waiting for the relief train his overshoes were put on him, that he stood on the right leg while the shoe was put on his left foot, which he could not have done if there was a broken femur. This came out on his cross-examination by defendant's attorney: ''Q. Was you sitting down or standing up? A. I was standing up. . . . It was a hard job, it hurt me fearful. Q. I am not asking you about that? A. Well, that's all right. Q. You stood up while those overshoes were put on? A. Yes, sir. Q. You held up that foot. A. I didn't hold it up. Q. How did they put it up? A. They pulled it up; they pulled it back this way I think. . . . Q. So that when they got that one on, you held the other one up the same way? A. I didn't hold the other up; I don't know how in the Cain they got it on; they got it on there.'' The sum of that evidence is that the two men helped him get his overshoes on his feet, how they did it he could not explain. If it is true that he was suffering at that time as he said he was, it is not astonishing that his memory should be at fault in this matter of detail, nor is it astonishing that with the help of two men he got his shoes on, even if he was injured as he says he was. Defendant's counsel had a right to make use of that fact in his argument to the jury, but if the jury should

believe that that circumstance did not necessarily convict the plaintiff of false swearing, we have no right to say that the jury was wrong, nor does it justify the broad charge of perjury.

The expert witnesses on both sides were men of learning and of high character, some of them of State-wide reputation. They differed as honest men pursuing an abstruse science may differ. The main fact in question which they were endeavoring to find was hidden in the body of the man. They used all the means that science had taught them to reach the truth, and each thought he had done so, although some of them were certainly wrong if the others were right. Which were right and which were wrong was a question for the jury. On the one side we have the suggestion that certain physicians and surgeons are in the regular service of this or other railroad companies, and on the other that certain physicians intruded into the case to become witnesses for the plaintiff. There is no just reproach on either for the cause mentioned.

There would be no use in attempting to epitomize the evidence in this opinion, there was a great deal of it on both sides and it was very conflicting; there was sufficient to have justified the jury in finding that the plaintiff's injury was slight if they had so found, and there was sufficient to justify them in finding that it was very great as they evidently did find. That finding is beyond the reach of this court; it would be a usurpation of the jury's province if we should undertake to weigh the evidence and find a verdict.

XVI. In his argument before the jury counsel for the plaintiff's attorney said: "Take a verdict in this case for $20,000 for instance." Counsel for defendant objected to counsel mentioning any amount; it was not the province of the party to do so, and was not proper argument; the objection was overruled.

Then plaintiff's attorney went on to say that the ordinary interest on $20,000 would not bring the annual income that plaintiff's strength and health had brought him before. Counsel for defendant objected, because it was contrary to the measure of damages given by the court; the objection was overruled.

The instruction on the measure of damages was as follows:

"The court instructs you, gentlemen of the jury, that if you find for plaintiff you should, in estimating his damages, consider his physical condition before and since receiving the injuries for which he sues, as shown by the evidence, the physical pain and mental anguish, if any, suffered by him on account of his injuries at the time of and since such injuries, as shown by the evidence; his loss of time, and such damages, if any, as you may, from the evidence, find it is reasonably certain he will suffer in the future therefrom, and you will find a verdict for such sum as in your judgment will, under the evidence, reasonably compensate him for such injuries including compensation for such reasonable amounts, if any, as the evidence shows he has expended for care and nursing, on account of said injuries."

There was nothing in the argument of the counsel in conflict with that instruction. It was a mere argumentative suggestion to the jury as to the amount he thought his client was entitled to. The argument of defendant's attorney as to the amount of damages which he thought ought to be awarded is not set out in the record, but if in his argument to the jury he said that in his opinion the plaintiff's injury was trivial and his damages should be nominal or small, as he would have had a right to, and as he has argued before this court, the argument would have been of the same kind as that complained of. We see no error in the overruling of that objection.

XVII. Appellant takes out a single clause in the instruction on the measure of damages and construes it to mean that the jury were authorized to allow damages not only for loss of time in the past, but loss of time in the future. The clause criticized is: "his loss of time, and such damages, if any, as you may, from the evidence, find it is reasonably certain he will suffer therefrom." The punctuation is a. little misleading, but we do not think the instruction is fairly subject to the criticism. Taking the clause in connection with the whole sentence the damages authorized for the future are those to flow from the permanent impairment of his physical condition. If any misconception was liable to be placed on that clause it was removed by the instructions given at the request of the defendant, wherein the jury were directed to "take into consideration the nature and extent of his injury and his loss of time. . . . "And you are further instructed that you cannot allow plaintiff anything under the pleadings and testimony in this case for profits of business; and that you can only allow him a reasonable compensation for his time necessarily lost as a result of the injury." The instruction also forbade the jury to allow punitive damages or to consider "possible or even probable consequences as to what may happen."

The allowance for the reasonable amount expended for care and nursing which the instruction authorized was justified by the evidence of the amount paid by the plaintiff for the board of his relatives at the hotel while they were there nursing him.

We find no reversible error in the instruction on the measure of damages.

XVIII. Defendant asked this instruction which was refused: "The court instructs the jury that there is no evidence in this case of impairment of plaintiff's ability in his capacity as manager or director of his farming, well-boring or other employments, and you

can only allow him for such loss of time as the evidence shows he has lost from his employments.''

The court gave that part of the instruction which said there was no evidence of impairment of plaintiff's ability in his capacity as manager, or director of his farming, well-boring or other employments, but left off the rest. The court should have refused the whole instruction, because there was evidence, a good deal of evidence, tending to show impairment of plaintiff's ability to attend to his various employments. The only error was in giving that part that was given, but of that the defendant has no right to complain.

The defendant also asked an instruction to the effect that plaintiff was entitled to no more than nominal damages for loss of time, which the court refused. There was no error in so ruling.

XIX. There remains one more assignment of error to be considered, that is, that the award of damages is excessive.

As we have already said, the testimony as to the extent of the injury was quite conflicting. The witnesses on one side thought the injury was slight and that the plaintiff had already recovered from its effects, those on the other side thought it was serious, that he had not recovered and probably never would, although they seemed to think his condition would improve.

The jury had to choose between these two classes of witnesses and they chose to believe that the testimony on the part of the plaintiff was more reasonable and reliable than that for the defendant. It was the jury's peculiar province to decide that question. If the trial court had thought the verdict was against the decided weight of the evidence it had the authority and it was its duty to set the verdict aside and grant a new trial, but when the trial court put its seal of approval on the verdict, it was beyond the ordinary

authority of this court to set aside the verdict if there was substantial evidence to sustain it, that is to say, as to the vital issues of fact in the case. We feel, therefore, bound to view the extent of the plaintiff's injuries in the light of the testimony in his behalf.

And when we come to consider the amount of damages awarded in such case, although we are not so strictly bound by the judgment of the jury, we are nevertheless bound to recognize the fact that the law has made the jury the judge in the first instance on that subject, and we are bound to defer greatly to their judgment. Not only has the law imposed that duty on the jury, but we know in fact that the jury has a better opportunity of judging the subject, in view of the injured man and of his witnesses, than an appellate court which sees only the printed record.

That the plaintiff suffered a severe injury in the hip joint, that he endured great pain and for several months was disabled from following his usual avocations, that he still suffered pain in the region of his hip and experienced an impairment of its use as late as the date of the trial, which was a year after the accident, are facts we are bound to recognize, and also that he would probably always suffer some impairment of the use of that limb, but it appeared from his own testimony that he had, to a great extent, recovered and was able to superintend and direct his business operations and his physicians thought that as time went on he would still improve, though never entirely recover. Under those circumstances we are constrained to think that the jury overestimated the amount necessary to compensate the plaintiff for his injury, and whilst we do not think that it would be just to set the judgment aside and remand the cause for a new trial without giving the plaintiff an opportunity to enter a reasonable *remittitur,* yet we also think that it would not be just to affirm the judgment for the full amount of the award, $12,500. If the plaintiff sees fit to

remit $5500 of the original award within ten days we will affirm the judgment for $7000, with interest from the date of the original judgment, otherwise the judgment will be reversed and the cause remanded.

All concur.