### JACKSON v. LA FOLLETTE HARDWARE & LUMBER CO.
#### No. 1267.

United States District Court,
E. D. Tennessee, N. D.

Nov. 21, 1950.

Sandusky & Krueger, Somerset, Ky., Poore, Cox, Baker & McAuley, Knoxville, Tenn., for plaintiff.

Hodges & Doughty, Knoxville, Tenn., for defendant.

ROBERT L. TAYLOR, District Judge.

In this case Kenneth Jackson, plaintiff in this lawsuit, with his brother-in-law, D. J. Garland, both young men, in the early morning of November 20, 1948, after having borrowed from his father-in-law a jeep vehicle, started from their home, which is a village near Somerset, Kentucky, to Knoxville, Tennessee, to attend a football

game between the University here and the University of Kentucky. The brother-in-law, Mr. Garland, started out to drive the jeep vehicle and continued to drive it.

They were traveling on highway 25W, driving at a reasonable rate of speed, when they came to a point on the highway where there was what has been referred to as a dripping rock. Jackson took particular note of this dripping rock, believing that it created a hazard on the highway, and he turned his head in the direction of the driver of the jeep and looked to the rear so long as he could see that dripping rock. As this jeep came to what has been referred to in the record as an incline or hill or a knoll, the driver continued the operation in the way and manner that he had immediately therebefore, namely, according to the witnesses, around 40 miles an hour on the right side of this highway. There is nothing in that operation to indicate to the Court that Garland was driving this jeep vehicle in a negligent manner, nothing to call young Jackson's attention to any alleged negligence on the part of this driver. He trusted him, his brother-in-law; he had driven in a normal manner from his home up to that point on the highway. Young Jackson did what others do, turned around and looked to the rear. He believed that his brother-in-law would get him to his destination in safety. There was nothing up to that point that caused him to change his opinion.

Now as this jeep came near to or on the brow of this incline or hill, in the opposite direction came a one and a half ton truck owned by the defendant and driven by Mr. Heatherly on a mission and within the scope of his authority as the representative of the hardware company.

The proof shows, all the proof as I recall it, that a Chevrolet, 1939 model, automobile was immediately in front of this truck traveling in the same direction of the truck and meeting the automobile in which plaintiff and his brother-in-law were riding. Some of the witnesses say that the Chevrolet automobile when it reached the brow of this hill or near the brow of the hill, suddenly stopped, the Chevrolet car, so that the occupants thereof could speak

to the boys presumably beside the road who were selling holly and who have testified in this case.

Some of the witnesses say that this Chevrolet stopped suddenly without warning. Others say that it stopped gradually and possibly one, or maybe two, states that it didn't stop at all, that it was slowing down. Mr. Heatherly said he had followed this Chevrolet automobile for a distance of four miles. His companion, a fellow employee, Mr. Bill Raines, stated that he had followed the Chevrolet automobile around six miles before the point of the accident.

Mr. Heatherly says that during the period that he was following this car that he was anywhere from 50 feet to 150 feet behind the Chevrolet car. He stated further that the Chevrolet car stopped suddenly at the brow of this hill, and that at that time, either on direct or cross examination, he said—I believe it was cross examination—that he was the distance of this court room, which has been stipulated to be around 50 feet, I believe, and 10 feet, which would make a distance, according to his statement, that he was behind this Chevrolet car when he said that it stopped a distance of 60 feet.

He said that when this Chevrolet stopped without notice to him that he immediately put on the brakes of his truck and because of defective brakes, of which he had no knowledge, that the truck veered to the left, and that he had no choice other than to go to the left into the oncoming jeep or to his right into the boys beside the road who were selling holly. So as he veered his truck to the left, the jeep came over the brow of the hill, and under those circumstances there was a head-on collision of these vehicles with the result that the jeep was knocked into the ditch, which the proof indicates was about a foot deep, beside the road, and the truck was against it in an angling position across or partly across highway No. 25W.

As a further result this young man, Kenneth Jackson, was knocked out of the jeep on the bank beside the jeep in an unconscious condition. His brother-in-law was knocked into an unconscious or addled

condition and remained in an unconscious or semi-conscious condition off and on until that night. These young men were immediately taken to the hospital, the Doctors' Hospital in LaFollette.

As a result of those injuries, Kenneth Jackson has not worked or has not been able to work, and the Court could see that without any medical testimony, that he is not able to work. He has been in court on crutches. And he has not been able to work since this accident. He necessarily has suffered severe pain as a result of these injuries. He has undergone six operations, one or more major operations on his left thigh and on his right knee, the injuries to his right knee being more serious and more lasting and more disabling than the one to the thigh, according to the medical testimony.

In my opinion, the driver of this truck was guilty of the sole and proximate negligence that directly caused this collision with the resulting injuries that immediately followed.

If the accident happened as he said it did, he was negligent because if he was driving from 60 feet going up that incline behind this automobile and he was looking ahead, driving as a reasonable prudent person under the same circumstances, he could have stopped that truck. It is my opinion that he was trying to pass this Chevrolet automobile on the brow of that hill, and that was negligence. I don't know a much more dangerous way to drive an automobile or any other vehicle than to try to pass a vehicle immediately in front on the hill or on the brow of a hill. If such driving doesn't cause death or serious injury, it is almost the exception to the rule; that is, driving a vehicle and trying to pass another vehicle on the brow of a hill when the driver undertaking to pass cannot see the oncoming traffic. If he was driving a truck with defective brakes, he was guilty of negligence under the circumstances shown in this record.

■ I find as a matter of fact and as a matter of law that the negligence of Mr. Heatherly in driving this truck under the circumstances shown in this record was the sole and proximate cause of this accident and resulting injuries.

■ I cannot see any negligence upon the part of Kenneth Jackson. He is an innocent party, driving along with his brother-in-law, as hundreds and thousands of other people on that very day were doing, coming to that football game.

■ Now we come to the most difficult problem, and that is the question of damages. What is he entitled to as a matter of right and as a matter of law? His damages cannot be measured mathematically, as we tell the jury in every charge that we make to the jury. We have to use our very best judgment, taking into consideration certain factors, among them the age and health of the injured party at the time and immediately prior to the injury, his earning capacity, pain and suffering, whether the injuries are temporary or whether they are permanent.

Kenneth Jackson has sustained specific damages of $5,202.10. In addition to that, Dr. Penn, a very capable surgeon, estimates that his additional expenses for hospitalization and medical treatment will amount to $800. Then he has sustained specific damages in the form of hospitalization and medical expenses and medicine in the aggregate amount of $6,002.10. He has been out of work two years and one day. He was making $140 a month or $1,680 per year. So his loss in earnings to date has been $3,360. That figure added to his hospital expenses makes $9,362.10.

According to the testimony, he is likely to lose another six months or a year, probably a year's time from work. That is a total loss, he is likely to be totally out of circulation insofar as work is concerned for another year. That would make $1,680 more, or $11,042.10.

Now what is he entitled to for his suffering and his pain and the injuries which will remain with him as long as he lives?

If there was any pleasant fact presented in this lawsuit, it was the testimony of Dr. Penn to the effect that this young man's left leg in his opinion will become reasonably good again, good to the extent that he can walk on it and use it in his work. But as previously stated, that right knee is more serious. I looked at it this morning at the request of counsel. Dr. Penn, I think, from his testimony, feels that that

leg with proper care—and I hope that he gets proper care—will probably get all right. I don't mean by that 100 per cent all right, but it will get so that he can walk, so that he can do some work. It may pain him to the extent that he will have to have fusing, and when he has fusing, he will lose bending action. But the probability is that it will be partially repaired and nature will put it in a condition where he can use it, certainly in walking, with the possibility of standing on it so that he can to some extent take up again the work for which he was trained, cabinet making.

Dr. Penn says that in his opinion plaintiff will recover to the extent, within the not too distant future, that he can do office work, a desk job. He is a graduate of a high school. He has had three years of training in the Kentucky state college. I guess that is similar to our state institutions here in Tennessee, what were formerly known as the normal schools and now as the teachers training school like they have at Johnson City and Memphis and Cookeville.

There is no proof in the record that this young man has any disfiguring scars on his face or on places that can be seen, is there?

Mr. Doughty: No, your Honor.

The Court: I fix the total damages in this case, gentlemen, as $21,000.